*Lorena M. WILLIAMS, et al.*
Petitioners
*vs.*
*Verdie Mae LEE, et al.*
Respondents

In the Family Court of the Navajo Nation
District of Window Rock, Arizona

No. WR-FC-1241-02

April 14, 2003

## ORDER

The above docket matter came before the court for a final hearing on March 18, 2003 at 9:00 a.m. Present for the hearing were petitioners Lorena and Victor Williams, and the respondents, Verdie Lee, Jasper, Delores Lee. Having considered the oral arguments, testimony presented and all relevant pleadings, the court enters the following findings and orders in this case:

### FINDING OF FACTS

1. This court has jurisdiction over the parties and the subject matter before the court.

2. On August 5, 2002, the petitioners filed with this court their petition against the respondents for quiet title and for preliminary and injunctive relief. Summons for the proceedings were issued on August 8, 2002.

3. On August 20, 2002, the court received the return of service on the summons and affidavit of service of process on respondents, Verdie Lee, Jasper Lee and Delores Lee.

4. The respondents, through counsel, filed an answer and counterclaim to the petition on September 3, 2002. On September 19, 2002, the court issued an Order scheduling the pretrial conference for October 24, 2002. The respondents, through counsel, filed an amended counter-petition on October 22, 2002, with the petitioners' concurrence. The court conducted the pretrial conference on October 24, 2002, and a minute entry to the proceeding was signed on October 30, 2002. The final hearing was scheduled for March 18, 2003. On February 20,2003, Mr. Samuel Pete filed an entry of appearance as co-counsel of record for the respondent.

5. Victor Williams and Verdie Lee are natural siblings. Lorena Williams is the natural mother to Victor Williams and Verdie Lee. Jasper Lee and Delores Lee are the natural children of Verdie Lee. Lorena Williams is the maternal grandmother of Jasper Lee and Delores Lee, and Victor Williams is the maternal uncle.

6. The area in dispute is located in the community of Steamboat, Arizona, approximately one-fourth mile east of Steamboat Chapter House. Lorena Williams and her late husband Paul Williams, Sr. settled the area in dispute in 1933, by building a log cabin on the land they selected. Lorena Williams and her husband resided in the log cabin, while her husband commuted to and from Kearns Canyon, Arizona to work. Lorena Williams and her husband never obtained a homesite lease or acquired any legal documents to the disputed property. Lorena Williams and her late husband did not inherit the property or receive permission from anyone to assume dominion of the area in dispute, or to the adjacent area.

7. In 1950, Lorena Williams and her late husband authorized Verdie Lee and her husband Ralph Lee, Sr. to reside in the log cabin they built. In 1953, Roy and Ruthie Kelwood also moved into the log cabin occupied by Verdie Lee and her husband with permission from Lorena Williams and her husband, Paul Williams, Sr.

8. In 1955 Verdie Lee and her husband moved out of the log cabin, and into a house they built located slightly west of the log cabin. The distance from where the log cabin was located to the new house is approximately 80 to 100 feet. Verdie Lee testified that her late father, Paul Williams, Sr. instructed her to assume the care and control of the area where she currently lives, and of the adjacent disputed area. Verdie Lee testified that sometime between 1974 and 1976 Victor Williams approached her and asked her for permission to move his mobile home to the area now in dispute. Verdie Lee testified that she gave permission to Victor Williams to move his mobile home to the disputed area on a temporary basis. Victor Williams made an addition

to his mobile home after moving to the area currently in dispute. During the hearing Verdie Lee did not define for the court, nor elaborate on what she meant by allowing Victor Williams move to the area in dispute on a temporary basis.

9. Lorena Williams also presented testimony to the court that between 1974 and 1976 Victor Williams sought her permission to move his mobile home to the area currently in dispute. Lorena Williams testified she gave authorization to Victor Williams to move to the area now in dispute. Victor Williams resided on the now-disputed property for nearly 14 years. The testimony showed that in 1990, Victor Williams left the area when he separated from his spouse. Victor Williams' spouse remained at the location for another two years, and then removed the mobile home sometime in 1992. When she moved, she left the addition to the mobile at the site where she and Victor Williams had lived together.

10. Testimony regarding Victor Williams' use of the disputed area over the years differs. Verdie Lee testified that Victor Williams started to move back to the area in dispute in June of 2002. Victor Williams testified that his presence has always remained at the area in dispute, and that he lived in the addition he had made to his mobile home. Victor Williams claims that the current dispute about the ownership of the property ensued when he attempted to move a new mobile home to the area where he had his previous mobile home. Jasper Lee offered testimony that Victor Williams never lived in the trailer addition. Jasper Lee claims to have used Victor Williams' addition to store his hay and feed for the horses he kept in a pen above the area in dispute.

11. Jasper Lee also testified that he currently uses the area in dispute to store his property, and that he uses the horse pens located above the disputed area. Verdie Lee testified that the area in dispute is also used from time to time for Native American Church ceremonies. Introduced into evidence at the hearing were photographs of the area in dispute from three different angles.

12. Following the March 18, 2002 hearing the court visited the site currently disputed by the parties. The witnesses' testimony accurately described the physical location and development of the property. The only exception the court found notably different from the testimony was the usage of the horse corral located above the dispute area. The testimony offered by Jasper Lee was that he currently uses the enclosure to corral his horses. An examination of the pen strongly suggests that the pen has not been used for an extensive period of time, even as much as two years.

13. Verdie Lee testified that Lorena Williams and her husband moved away from the area in question in 1944. Lorena Williams testified that her family used two areas of residence, depending on the season. She testified that in the winter the family moved to Steamboat (area currently in dispute), and

that in the summer they moved to a summer camp in the area known as *Bálók'aa'*. The *Bálók'aa'* camp is located approximately thirteen to fifteen miles northwest of the Steamboat Chapter House. Lorena Williams testified that she never relinquished her claims to the area in dispute.

14. Delores Lee did not offer any testimony or evidence for the court to consider. Verdie Lee did testify that she is now in the process of obtaining a homesite lease to her current residence.

## ANALYSIS AND CONCLUSIONS OF LAW

The fact pattern in this case presents a matter of first impression for this Court. There is no Navajo case law on point to assist the court in deciding the issues presented in this case. There is a great deal of precedent regarding the propriety and use of land when grazing permits and/or other land-use permits are involved, and for the disposition of property after the death of one who holds a land-use permit. *See Yazzie v. Catron*, 7 Nav. R. 19 (1992); *In the Matter of the Estate of Charley Nez Wauneka Sr.*, 5 Nav. R. 79 (1986); *In the Matter of the Estate of: May D. Bennally*, 5 Nav. R. 174 (1987). However, the present matter is a family dispute over the use and propriety of land that has not been claimed through any land-use permit, and neither party claims a right to the property through probate.

The parties involved are Navajos and the venue is properly in Navajo court. Although there is no decisional law from the Supreme Court on point with the facts in the present case, there is ample case law and statutory authority to guide the Court toward the appropriate tools of analysis. Absent applicable federal law, it is clear to the Court that its analysis in this case must focus on applicable Navajo custom. *See* 7 N.N.C. §204(A)(1995). The Court looks to *Diné bi beehaz'áanii*[1] including *Diyin bitsáádéé beehaz'áánii*[2], *Diyin Nihookáá Díne'é Bi Beehaz'áanii*,[3] *Nahasdzáán dóó Yádiłhił bits'áádéé' beehaz'áánii*[4] and *Diyin Nohookáá' Diné bi beehaz'áanii*.[5]

The control of and authority over land in the Navajo Nation is unique compared to that in the states, and principles of land use are guided by much more than tangible documentation, titles or contracts. Therefore, this Court will explore some of the concepts of family, land and the relationship between the two to determine the most equitable disposition of this dispute. Specifically, the Court must examine four issues:

1. How did the property come into the possession of the disputing parties?

2. Who is the proper person to determine the disposition of the property?

3. Did Victor Williams abandon the property by moving away in 1990?

[1] Navajo Fundamental Law
[2] Navajo Traditional Law
[3] Navajo Customary Law
[4] Navajo Natural Law
[5] Navajo Common Law

4. What are the considerations which give the disputing parties possessory interest of the property?

## DISCUSSION

The record shows that in 1933 Lorena Williams and her late husband Paul Williams, Sr. were looking for a place to settle. The record also shows that petitioner Lorena Williams was born in the *Ba'lók'aa'* area around 1910, as she reports to be 93 years of age. When she married Paul Williams Sr. they decided to live in Steamboat, Arizona. The area they selected is now the area in dispute. According to the record the area selected by the petitioner Lorena Williams and her husband was not inhabited at the time of their settlement. People lived in the surrounding area, but the population was very sparse. The record further shows that the people who were the original inhabitants of the area in dispute were those of the *Naakaii Dine'é'* clan. In fact, the descendants of that particular clan group still live in the surrounding area. When Lorena Williams and her husband selected the place where they wanted to live in 1933 they built a log cabin. From this location Paul Williams, Sr. was able to commute back and forth to Keams Canyon for work. The record does not show whether anyone raised any objections to Lorena Williams and Paul Williams, Sr. assuming dominion of the area where they constructed their home. As time passed it became apparent to the people within the community that the area they occupied and developed was the property of Lorena Williams and Paul Williams, Sr.

By living in the area currently in dispute for an extended period of time and developing the area for residential purposes Lorena Williams and Paul Williams, Sr. solidified their rights to exercise control and have domain of the area. By virtue of their marriage, the control and decision regarding the disposition of the property settled by Lorena Williams and Paul Williams, Sr. was equally shared. With respect to the property, neither party held a majority share or had sole decision-making power. If the facts were different, Navajo law would dictate otherwise. For example: if one party came into a marriage to a settled and established family with a land base, the control and decision regarding the property would be deferred to the host family member and/or his or her family. But in this case, the land base was not established by one family or the other, and Lorena Williams and her husband were married prior to settling on the property. Together, they worked to build a residence on the property and to make the land flourish for the benefit of the marriage and for their children. Pursuant to Navajo common law, this Court finds that Petitioner Lorena Williams and her husband jointly obtained and controlled the property.

By establishing possessory rights to the area currently in dispute, Lorena Williams and her husband were in the proper capacity to decide the immediate and future disposition of the property. Since Lorena Williams and her husband were the "proprietors" of the area in question, Verdie Lee sought permission from her father to live in the log cabin of her parents. Verdie Lee did not seek or obtain

permission from her mother, and the record indicates no objection or protest by Lorena Williams. Pursuant to *Diné bi beenahaz'áanii*, parents should be supportive of their children's efforts to find a place to live independently. When Verdie Lee asked to live in her parents' cabin, she was pursuing that independence, and there were no objections from either parent. Her father verbally gave her permission, while her mother Lorena agreed silently. To denounce a child's effort to be independent defeats the traditional teaching that it is incumbent upon each individual to become self-sufficient. To achieve self-sufficiency an individual, on their initiative, must go and put forth the effort to establish a foundation of life. A starting point toward self-sufficiency is for an individual to wean themselves from their dependence on their parents. Building one's own home or securing employment are examples of that effort. It is the planting of a seed to establish life and stability of an individual. This Court finds that Verdie Lee was following that teaching when she requested permission from her parent, and moved into the log cabin while she began constructing a home of her own.

In the mid-1970s, Victor Williams approached his mother for her permission to move his mobile home to the area now in dispute. Victor Williams' father did not object to his son's request to move onto the now-disputed area, for the same reason that Lorena did not object when her daughter requested the same so many years before. The Court reiterates that Lorena Williams and her husband jointly obtained and controlled the property, and that both had the equal ability to make allowances for the use of that property. When Paul Williams, Sr. died in 1979, Lorena Williams became the remaining proprietor of the area presently in dispute. Under Navajo custom elderly patriarchs and matriarchs are highly revered. Their decisions and guidance are respected and adhered to.

Lorena Williams still lives on the land in the area she and her late husband settled in the early 1900s. As long as she is among her family and people, Lorena Williams is the head of the family in the context of overall family decisions. Lorena Williams is one of the original proprietors of the property in question. After her husband's death, she retained the standing to decide who may and may not live on the land in dispute.

Verdie Lee testified that her father yielded to her the area in dispute and the area of her current resident as her separate domain. She claimed that she was told by her father to "take care of it," referring to the now-disputed area. No evidence was presented with respect to why the other siblings and Lorena Williams were excluded from participation in the decision about the property, or why they were not given a share of the area in dispute. Absent testimonial evidence, the Court relies on Navajo common law and traditional thinking. The Court finds that the intent of Paul Williams, Sr. was that Verdie Lee retain the property for the benefit of the family and the descendents of the family.

Even if Paul Williams, Sr. made any declaration about the property, his surviving spouse's share and interest in the property could not waived by

him. Pursuant to Navajo common law, a man and woman will work together and toil throughout their lives to see the fruits of their labor for the benefit of their families and generations to follow. Lorena Williams, working with and beside her husband, experienced the "numbness of her hands" from the hard work to develop the property for the benefit of her family.[6] After the passing of a spouse, Navajo custom dictates that the surviving spouse must assume the lead responsibility in the family decision-making, and is to be recognized as the head authoritative figure of the family. It is not uncommon to find that family members seek the wisdom, sound decisions and blessings of the elders of the family regarding land use and grazing issues, because the elders of the family are usually the original proprietors of the land or permit at issue. Such is the case here. The Court finds that as the remaining original proprietor of the property and as an elder of the family, Lorena Williams is the proper person to make decisions regarding the property, including who may and may not live there.

As discussed above, clan and family relations are paramount in determining the control and authority over land. In this case, there is no doubt that the property was originally settled and controlled by Lorena Williams and her husband, and there has been no argument to the contrary. It has been established that Lorena Williams is the proper person to make decisions about the property in dispute, and that in the mid-1970s she gave permission to Victor Williams to live on the property. Verdie Lee claims that even if that permission was valid, Victor Williams abandoned the property when he moved away in 1990, and that his long absence from the property severed any interest he may have had in it. The Court disagrees.

Because so many individuals and families make use of specific plots of land but federal law prohibits those individuals from possessing title to it, it is essential that concepts of Navajo common law be examined, relative to the specific facts of this case, to determine who has the possessory interest in the land and whether Victor abandoned the property. Under Navajo custom, abandonment of land has considerations far beyond whether a person physically lives on the land, and the fact that a person moves away from a property does not create a presumption that another person may claim or use that property. Considerations under Navajo custom include landmark identification, k'é and the placement of one's umbilical cord.[7]

When a person uses or improves the land with buildings, corrals, fence, or other landmarks, he creates for himself a customary use ownership interest

6 "Numbness of the hands," is a common expression used in Navajo to describe the hard work and effort made by a person to achieve a feat.

7 The Court wishes to acknowledge the importance of umbilical cord placement in Navajo common law, in determining ownership, control and authority over a piece of land or property. However, because neither party presented evidence with respect to umbilical cord placement in this case, the Court will not discuss this concept in further detail.

in that property. *See Hood v. Bordy*, 6 Nav. R. 359 (1991). Landmarks used for the identification of customary use are usually dwellings, and may include a house, a hogan, a *chaha'oh*,[8] or even a foundation for a planned dwelling. Sheep and livestock corrals or enclosures are other landmarks that identify prior usage or a claim to an area. Pursuant to oral testimony, exhibits accepted into evidence and the Court's own examination of the site, several landmarks exist on the disputed property. A reusable foundation for a dwelling, a tool shed, a sizable amount of lumber remaining from the addition to the mobile home, a foundation for a Hogan, and two animal enclosures are the most obvious landmarks.

*K'é* contemplates that while an individual within Navajo society enjoys a large degree of freedom, that freedom "must be exercised with respect for self, family, clan relatives, and the community at large." *Atcitty v. Dist. Ct. for the Judicial Dist. Of Window Rock*, 7 Nav. R. 227, 230 (1996). *K'é* promotes cooperation and compassion, while stressing the reciprocal duties and responsibilities owed between individuals, allowing the members of a community to thrive in *hózhǫ́*. The Court has already discussed Lorena's control and authority over the property, which arises in part from *k'é* and the importance of recognizing her status in the family as a matriarch and original settler of the property. *K'é* also dictates that other individuals recognize and respect the landmark identifications detailed above. There was no evidence presented to the Court to suggest that Victor intended to abandon the property in dispute, or that he intended never to return or use it in the future. Regardless of the length of time that has passed since Victor's physical presence on the land, the remaining foundation, shed, tools, lumber, and animal enclosures evidence his use of the land. Those landmarks should be respected by others within the community, whether they are Victor's relatives or not.

## CONCLUSIONS AT LAW

Through an exploration of some *Diné bi beenahaz'áanii* concepts and their application to the facts before the bench, the Court makes the following conclusions in this case:

Lorena Williams and her late husband originally settled the property in dispute in the early part of the 1900s. At the time of the initial settlement, the land was not controlled or used by Lorena Williams' clans, nor was it controlled or used by her husband's clans. Therefore, the Court finds that the couple gained authority over the land jointly, and worked together to maintain the property for the benefit of the marriage and for their family. Both Lorena Williams and her late husband had equal decision-making power with respect to the property in question. At some point over the years, both Verdie Lee and Victor Williams obtained valid permission to reside on the property, and both parties did, in fact, reside on the property for many years. Despite Victor's departure from the property in 1990, the landmarks remaining on the property and the concept of

8 A summer shade house.

*k'é* determine that he did not abandon the property when he left. However, the fact that Victor did not abandon the property has no bearing on this Court's decision in this case, and it cannot rule that Victor Williams is entitled to reside on the property or that he has any authority or control over it.

The only person who retains decision-making authority over the property in dispute is Petitioner Lorena Williams. With her husband, she initially settled the area and she is the surviving matriarch of the family. As such, she may determine who may or may not reside on the property, or use it for another purpose.

## JUDGMENT

For the foregoing reasons, the Court hereby finds in favor of Petitioner Lorena Williams, and ORDERS that upon her request the trailers blocking entrance to the disputed property be removed. Further, if Ms. Williams gives permission to Victor Williams to reside on the property, he may do so. The Court reiterates that Lorena Williams retains decision-making authority over the property that she settled.

The general nature of legal decisions in the adversarial system is that one party "wins" and another "loses," and the Court is disheartened that the parties are involved in this legal dispute, and that they felt it necessary to resolve it in this manner. As in any family dispute, especially one involving property and land-use, it is anticipated that other issues may arise in conjunction with this Order. Should that occur, the parties are free to return to Court for a further resolution or clarification of this matter. However, the Court counsels the parties to respect themselves and each other, and to remember their duties and responsibilities so that they may live in *hózhǫ́*.